When Title VII's exhaustion requirement is satisfied, the power to address an employment discrimination claim shifts from the executive to the judicial branch. The exhaustion requirement is therefore jurisdictional, in the plainest sense of that word. And that is confirmed in at least three different cases.  First, the text and structure of Section 2000e-5 demonstrates that the exhaustion requirement is jurisdictional, ensuring that courts do not reach the merits of a claim before it has been presented to the expert agency. Ginsburg But the expert agency, unlike the examples that you give of agencies that have adjudicatory authority, the EEOC has no authority to adjudicate. Yes, you have to let the complaint stay there for 180 days, but they don't decide anything, or even if they decide, they dismiss your claim. That has no preclusive effect in the Court. So it's one thing to say when Congress sets a scheme where the agency is the equivalent of a court of first instance, it makes a decision, and that decision is reviewed. But in a Title VII case, the Court is never reviewing the decision of the EEOC, because they don't have any authority to make decisions. Kagan Well, Justice Ginsburg, I think the important question with respect to jurisdiction is whether the agency has been empowered to attempt to resolve a claim. I don't think whether the way that it resolves it, whether the way that it's been empowered to resolve it, whether it's adjudicatory or non-adversarial, I don't think that matters. What matters is whether Congress vested authority in the agency to attempt to resolve it. And I think with respect to Title VII, it's correct. The agency is not using adversarial proceedings, and that's because, as we know, Congress intended for employment discrimination claims to be resolved in a non-adversarial matter, to be resolved through conciliation or cooperation or means like that. And so it wanted the agency to have the power to do that. And leaving the door open for the adversarial judicial process at the same time would certainly have undercut that intention. And I would also say that the agency does, in fact, make decisions. It makes a no-cause or a cause determination. And it supervises conciliation, and if there's a conciliation, then there is no right then to go to the court. So it is the case that if the EEOC does nothing within 180 days, you can go to court, and the agency has done absolutely nothing at all. That's correct. It's similar to McNeil, another case this Court had with the Federal Tort Claims Act, where it was the Federal Tort Claims Act did have a question. Federal Tort Claims Act, you are suing the government. You are suing the United States. The United States has sovereign immunity, and it can say you can't sue us unless. There's no question about sovereign immunity here. There very much is in two important ways. First of all, State sovereign immunity is certainly implicated by Section 2000e5 because it gives parties the right to sue States. But also, Section 2000e5 and the exhaustion requirement we're speaking of. Ginsburg, how does Congress give the States, give a party the right to sue a State as Congress has waived immunity? That's correct. But the question is how narrowly to construe the waiver of sovereign immunity. And this Court has repeatedly held that waivers of sovereign immunity, both with respect to States and the Federal Government, need to be narrowly construed. And I'd also just like to add, Section 2000e5 does implicate the Federal Government's immunity because Section 2000e5-F is expressly incorporated in Section 2000e16, which is the provision that allows for parties to sue the Federal Government. Yes, but I thought that Title VII waives that immunity. It waives the immunity, but again, the question is how broad a waiver is there. And we know it needs to be narrowly construed. If Congress said, yes, you can bring suit against the Federal Government, yes, you may bring suits against a State, but only after you have attempted to resolve this claim through nonadjudicatory methods, then we need to honor Congress's decision about the breadth of the waiver that's at stake in that case. Do you think that Congress meant that if you take a case, Title VII case, take it to a district court, take it to a court of appeals, the defendant has said not one word about exhaustion, the defendant loses in the district court, loses in the court of appeals, and says, ah-ha, there was no exhaustion, all bets are off, we win? I think that is one effect of this being jurisdictional. And yes, Congress very much did say that this is a jurisdictional rule. But I think that that is focusing on one relatively rare instance, rather than on the reasons that Congress would make a provision like this jurisdictional. Ginsburg. What about the notion that if Congress wants to make something jurisdictional, of course it can, like it's made the amount in controversy jurisdictional in diversity cases. But it didn't do that here. It didn't say it's jurisdictional. I think that it did. I think that the text of Section 2000e5 makes very clear that a civil action may be brought only after the EEOC has either dismissed the claim or has 180 days have passed, and then Section 2000e5-f-3 only confers jurisdiction over actions brought under this subchapter. So I think it's pretty clear. Ginsburg. Two separate sections. One is the jurisdictional section, that's f-3, and that doesn't say anything at all about exhaustion. Exhaustion is in a separate provision. They are not linked together in one provision. So they are both in subsection f. And one is subsection f-1, and the other is subsection f-3. And they are certainly linked by the specific textual clues, which is that subsection f-3 says you only have jurisdiction over actions brought under this subchapter. And then subsection f-1, in exactly the same term, says a civil action may be brought only after the claims have been dismissed by the EEOC or after 180 days have passed. So I think there's not a difference. Ginsburg. How does that differ from a suit for copyright infringement may not be brought until the copyright is registered? Well, there I don't think there was a – it wasn't in the same provision as the express jurisdictional grant. I also think, you know, we're not just looking at text in isolation. You have to look at text in context. And here we have this very – this text linked explicitly to the jurisdictional provision. And it's part of an intricate scheme for statutory and judicial review. And this Court, in case after case, has said that when Congress sets out – But it's not – you just used the word review. It's not judicial review. It's an agency, and then the Court is hearing the case de novo. It is not reviewing anything that the agency has done. Well, that's – the Court has used the term review to refer to what the agency does. And so I don't think it's using review in the sense of there has to be a decision in front of it that it's looking at. And in fact, we know that, because it used the term – But you used the word judicial review. So it's the judiciary is reviewing something. But here in the Title VII case, the judiciary is reviewing nothing. No, it's reviewing the actions. It's reviewing the claim of employment discrimination in the same way that the agency is reviewing the claim of employment discrimination in the first instance. But it's not using that claim de novo. There's no – the word review – review is reviewing something. It isn't – it's taking a first view, and a first view is different from review. Well, I'm not sure that that's how the Court has been using it, because it refers to administrative review, and we all agree that the agency is acting in the first instance. So I think it is referring to reviewing a claim, and certainly the courts are reviewing a claim. But again, I don't want to get too bogged down in this. There is de novo review, but we think, again, that that is because Congress was setting out a scheme that was designed to encourage litigants to first go to this non-adversarial process. Ginsburg. Ginsburg. Well, that's satisfied by making it mandatory. This is a mandatory rule, and if the defendant raises it, that's it. But when a defendant doesn't raise it – let me ask you a question about the premises of our system. Ordinarily, we follow, as civil law courts don't, the principle of party presentation. So it's left to parties to frame their complaint, frame their answer. And the Court doesn't frame the questions, and you don't frame the defenses. So what you're suggesting really runs up against that main theme, that it's up to the parties to state their claims, up to the defendant to raise objections, defenses. I think that in John R. Sand, the Court recognized that jurisdictional rules don't function in that way, and they don't function in that way because they are generally intended to vindicate system-related goals. And it's very clear here that Title VII's exhaustion requirement is vindicating system-related goals. As we were discussing, it's helping to protect sovereign immunity. It's also ensuring that the EEOC has its central role in the employment discrimination context. And it can't have that role if litigants are able to sort of do side agreements and just evade the EEOC entirely. Ginsburg-Miller What do we do with one other facet of Title VII? Title VII is written for employees to state their grievances, and in many of these cases, these people are not represented at all, or if they are represented, it's not a counsel of your quality. Is that a factor that should be taken into account? I think that in enforcing the exhaustion requirement, courts have taken that into account, and it's sort of similar to the notice of appeal setting, where a notice of appeal is a jurisdictional requirement, but this Court has been relatively flexible in order to recognize that sometimes there might be difficulty in satisfying that and to ensure that people do have their day in court. And so I think if you look at the case of the Court of Appeals, I think it's a matter of whether or not it's a jurisdictional requirement, whether or not it's a jurisdictional  requirement, and how equitable it may seem to give you some. That's exactly right, Mr. Chief Justice, and I wouldn't disagree with that, but it is that flexibility in what is regarded as a notice of appeal that I think has translated into the EEOC context, where there's some flexibility in what is regarded as an adequate charge. But what there is no flexibility on, and I would agree with you completely, because this is a jurisdictional requirement, there isn't flexibility on whether a charge is required. And again, I think there's multiple reasons for that. There's a long line. Alitoson, you place some considerable reliance on the 2000e5f3, the jurisdictional provision for Title VII, but what if that didn't exist, so that a plaintiff would have to rely solely on 1331? Would you have the same argument? It would be a different argument, quite candidly, because we do have a textual link here between the exhaustion requirement and explicit grant of jurisdiction. But we know that when Title VII was first enacted in 1964, this was it, because the 2000e5f3 was it, because 1331 had this amount in controversy requirement. And so Congress created a special grant of jurisdiction. It textually linked that to the exhaustion requirement. And I don't think this Court has ever held that 1331 can sort of be used as a get-out-of-jail free card. In, you know, the general grant does not apply where a specific remedial scheme has demonstrated that it isn't available. And we see that in Thunder Basin, we see that in Free Enterprise Fund and in Elgin, where the Court is looking at whether that general grant of jurisdiction under 1331 has been displaced by a specific remedial scheme. And that's what Congress does that, as it did in Social Security Act. Ginsburg. So we have 405, and it says 1331 is not available. So when Congress doesn't want 1331 to be there, it says so. I don't think that's always true. In fact, again, in Thunder Basin, it was facially silent, and yet this Court held that 1331 was displaced. Even in some of this Court's Social Security Act cases, it has said, well, this particular claim isn't really covered by these explicit provisions, but we don't think that Congress would have wanted claimants to be able to evade this remedial scheme by using 1331. And that's exactly, again, what we have here. And as we note, it's not just these more recent cases, but cases dating back over a hundred years that we've seen. Ginsburg. Yes, when a hundred years when courts use expressions like mandatory and jurisdictional. And as you know, this Court has said courts have used the word jurisdictional to mean many things, too many things. And this Court tried to bring some order into a division between claim processing rules and jurisdictional rules. And your argument seems to want us to back away from that division. No, absolutely not. Our argument is that this type of exhaustion requirement fundamentally affects the power of the courts, because Congress, rather than vesting power in the courts, Congress vests power in the administration. Sotomayor Can you imagine any administrative scheme that would not be jurisdictional? You seem to imply that we were wrong in Reed-Isaver and in Homer City because in both of them there were administrative processes, and yet we didn't find their preconditions to be jurisdictional. So tell me, I think it's a new rule, I've never seen us say it, if you have to exhaust it, it's always jurisdictional if you don't. And why does Congress bother writing into statutes something like they did in Thunder Basin, where they said if you don't raise something before the agency, the court can't consider it? Why bother with that? That's what you're saying now. No, we're absolutely not saying that. We're not saying that every single type of exhaustion requirement out there, whether it's about notice and comment rulemaking or State administrative procedures or whether it's a statute that makes clear that the administrative scheme is not exclusive, any of that, no, no, you've got to, you know, the exhaustion requirement is jurisdictional. No, we're saying that when Congress sets out a scheme that is clearly designed to be the exclusive scheme for individualized resolution of claims, that this Court has held, and this isn't a new rule, this Court has repeatedly held that when it does that, it doesn't leave the courtroom door open so that litigants may evade that careful scheme by going directly to the courts. And again, that's not a new rule. That's what this Court has been saying since as far back as Texas and Pacific Railway in 1907. It was saying it about the NLRA, which is a court of appeals that reviews the decision. And this is just the EEOC doesn't have that kind of authority. EEOC can't adjudicate anything. It can't make any findings. It can resolve something only if the parties both sides agree to it. So, Justice Ginsburg, the NLRA has been repeatedly looked to as the model for Title VII's remedial provisions. And in fact, in Zipes, this Court held that the NLRA's timely filing requirement was not jurisdictional, and that was good evidence for why Title VII's timely filing requirement should be non-jurisdictional. Now, that was, you know, the NLRA scheme there was adjudicative, but the Court didn't think that difference was significant, and it's not significant in this case either. Because what is important is that Congress empowered the agency, not the courts, to address the to address Title VII claims in the first instance. Ginsburg, and not to resolve it, not to resolve it. And that's an enormous difference between the Social Security Administration or the NLRB. They decide a case in the first instance. A court then reviews it. Here, the EEOC can't decide anything. I don't think decision can be key, and that's because of this Court's decision in Elgin. In Elgin, the Court acknowledged that it was very possible that the agency had no authority to decide the constitutional claims at stake there. But nonetheless, the Court held that it was a jurisdictional rule. That you had to go there first, even though you might have a constitutional question, and the Court carefully explained that the court might the case might drop out on another ground, and therefore, the Court would never have to get to the constitutional question. So Social Security, you have to go before the agency first. You may be you may have a constitutional question, but it may be that you don't qualify because of one of the statutory grounds, and that's what the agency can adjudicate a must do before the court can consider the case. And that's exactly right. What this Court was concerned with was the fact that a case or a claim might be fully resolved before the judicial the judicial branch had to weigh in, and that's exactly what we have here. Congress created a scheme that limited the jurisdiction of the judiciary by giving authority first to an agency that would resolve some of the claims so that the judiciary never has to pass on it. Ginsburg's not resolve any legal question, nothing. It can only be has a conciliation rule. It can do that. But to conciliate, both parties have to say yes. It can't decide any disputed issue. You would agree to that. The EEOC has no authority to decide an issue that the parties dispute. There's de novo review of what the EEOC does decide, which is cause or no cause. I would also say it's performing a very effective funneling function regardless. I think that in 2016, the EEOC had about 70,000 claims, and Lexis estimates that there were about 7,000 EEOC suits. So it is performing a function, exactly the funneling function. As a practical matter, that will still be true so long as defendants raise the argument that something has not been properly exhausted. And on the practical implications, wouldn't your rule put a new burden on courts to look through the record to make sure each claim was specifically exhausted? And isn't that very fact-bound? And why shouldn't the courts be able to rely on defendants to do that in the first instance rather than doing it themselves in each and every case? I think because the incentives that a defendant has aren't precisely aligned with the system related goals that the exhaustion requirement is vindicating. And so there are going to be instances where defendants aren't raising the exhaustion requirement. There are actually lots of cases where courts in the circuits where it is jurisdictional have to address it sua sponte. And Congress intended to raise an objection that results in dismissal of the case. It won't always result – it will result in dismissal of the case, but it may be that the employee will be able to go back to the EEOC, exhaust, and then return to court. So in that instance, of course – Ginsburg. Isn't there a time problem with doing that? There may or may not be. If this system is functioning effectively, such that when, for example, a pro se litigant files a suit without having gone to the EEOC, that it will be promptly dismissed, there's 180 days and there's equitable tolling. So in some circumstances, there's actually 300 days. So the idea that this will just – that every time if an employer raises it right at the outset, that will just get rid of the suit. Well, but the EEOC procedure is likely to be a real waste of time. I mean, here the parties have been litigating for how long? At least 5 years. 5 years. And now you would have them, assuming you can get through the time barriers, you would have them go back and say, well, let's go back to the EEOC and see if we can work this thing out. There's been a lot of time and energy invested in trying to win as opposed to resolve it. There would be no real purpose in sending it back to the EEOC in this case. Well, I think this is a marginal case. And of course, the question is what Congress intended, not what might happen in this specific case, which is very rare as far as we can tell. There are only two other examples that Respondents have been able to point to where anything like this has happened, ones from 1982 and ones from 2000. So this isn't something that's coming up all the time. But even if it were, the question is what did Congress dictate? Did Congress say that this was jurisdictional? And we've pointed out that the text, the structure, the purposes all demonstrate that it did. Roberts. If it had passed this legislation after 2006, it seems to be about the time we adopted a much more focused understanding of jurisdictional, requiring a pretty clear statement. You really wouldn't have much of a case, would you? I don't think that's correct. Again, I think there is a the text makes it pretty clear. I also think that from 2006 on, the Court has regularly recognized that the clear statement rule applies to the extent it accurately reflects congressional intent, which means that when a long line of this Court's precedent, undisturbed by Congress, treats a particular type of statutory condition as jurisdictional, the Court will presume that it follows suit. And as we've pointed to, there is a long line of this Court's precedent that establishes that when Congress creates an intricate scheme of administrative and then judicial review, it generally intends that to be excluded. How do you distinguish, sorry, how do you distinguish EME Homer on that point? EME Homer is about notice and comment review. It isn't about. But it's about a scheme designed to make sure that the claim or the issue, since they claim the issue is first raised to the agency, with the idea that the agency would then take that into account. I think in this case and in all of the examples we've cited, what we're talking about in terms of administrative review provisions is individualized claim resolution provisions. So once you have a claim, what do you do, where do you go? Do you need to go to the agency or can you go directly to the courts? EME Homer wasn't about that. It was about notice and comment review. First of all, that's not individualized. You don't actually even have a claim. So when it is individualized, to pick up on Justice Sotomayor's question from earlier, are you saying that we should usually presume that Congress intended an administrative exhaustion scheme to be jurisdictional? The question is congressional intent. That is what this Court needs to look at. Now, yes. But how would we look at that in the scheme, individualized claim proceeding administrative exhaustion requirement? That's all we know. What else do we need to know? Well, as the Court said in Elgin, you look at the text, you look at the structure, and you look at the purposes. So you look at the text to see how intricate is this scheme and how comprehensive is it? Does it seem to actually cover all claims or does it seem pretty isolated? I mean, I think Brown versus community, sorry, pardon me, Block versus community nutrition is an example of that. There, the scheme really wasn't comprehensive, and so the Court didn't find that it precluded any direct avenue to the district courts. So after you look at the text, you look at the structure. Again, and there's a little bit of overlap here. It's basically is there a detailed administrative review scheme and then that culminates in judicial review. Again, you have that here. And then you look at the purposes. Is this the sort of scheme that would best be forwarded by channeling all things to the administrative agency in the first instance? And again, that's certainly the case here. And if I could reserve the remainder of my time. Roberts. Thank you, counsel. Mr. Melkonian. Mr. Chief Justice, and may it please the Court. This Court has held numerous times in Zipes and Arbaugh and in many other cases that statutory limitations are not jurisdictional unless this – unless Congress has said they are jurisdictional in a clear statement. That is meant to be a readily administrable bright-line rule. There is no. Well, the statute, of course, was passed before that. Yes, Your Honor. But I think that the Arbaugh clear statement rule is intended to be the best way to discern congressional intent. That's what this Court said in Henderson. And when you're talking about a situation where Congress might have been doing something very unusual, that is imbuing a statute with jurisdictional status, with all the harsh consequences that come with jurisdictional status, the waste of time, the burden that this would place on the district courts, I think it's right that the Court should demand a clear statement from Congress before saying that Congress meant to make a jurisdictional rule. And you do that in other kinds of contexts with these kinds of consequences as well, such as extraterritorial application, things like that. You ask for a clear statement because the consequences could be very severe. And then, if I could answer your question sort of jurisprudentially directly, you have held that Arbaugh, the clear statement rule, applies to preexisting statutes again and again. The only exception is that Arbaugh was a Title VII case. And then every single case other than Patchak was applied the clear statement rule to a statute that preexisted at Arbaugh. Roberts' How does that make sense? I mean, the idea is that the clear statement rule is, we're going to look for a clear statement because of this, starting now. I mean, everybody knows it was a real mess before then. But you can't sort of say that Congress was on notice that it had to give a clear statement prior to the time that we said that. No, Your Honor, and that's where I come back to my first answer, which is that this is the way of discerning congressional intent in these very important cases where the question we're asking is, is this of the high level that it would have to be to be a jurisdictional status? Are we going to want to impose these kind of costs on the Court and on the parties and litigants? And do we want to give Congress clear guidance on what they're supposed to be doing in the future when they're deciding what to do with statutes, whether to amend them or whatever else? The reality is that I doubt Congress even thinks about or in the past has thought about this issue. That's probably right, Your Honor. And so in the absence of the clear statement rules intended to give us guideposts of how to discern that. I agree with that, Your Honor. Because if there's clear history, as there was in whether an appellate rule is jurisdictional or not, we follow the history. That's right. And I think that's a way of discerning clear, a clear statement from Congress. But there's no history here. There's absolutely no history here, Your Honor. Those cases that you're talking about, I think it's Bowles and John R. Sandman Gravel, those are cases where there's 100 years of direct precedent of this Court and of all the courts of appeals. There is nothing like that in this case. In fact, the only cases we have are Zipes and Arbaugh, essentially, and those are cases that cut in our favor. Every other case that this Court has analyzed a jurisdictional rule is in, where the scheme is similar to us. You have to do something before you go to district court. Those have looked exactly like our case in terms of the final resolution. This Court has held that they are not jurisdictional. So EME, Homer City, Union Pacific, Mock Mining, all those cases, Henderson, Reed, Elsevier, all of them come out our way. And in some of those, the language and the text of the statute is better for our friends on the other side than the statute. Roberts. What about Elgin? Elgin, Your Honor, I think handles a very different set of circumstances. As Justice Ginsburg was saying, those are cases where essentially jurisdiction has been stripped from the district courts, an administrative agency adjudicates the case, and then there is judicial review that's funneled to a particular court of appeal, or a district court, it doesn't matter, but it's funneled to a court. And those are completely different. The EEOC doesn't adjudicate anything. There is no review. There is no administrative record. There is no risk of sort of differing. Some of the cases our friends cite in their reply brief are about inconsistency in tariffs across the country, and there is nothing like that here either. So I think the Elgin line, the Thunder Basin, all those cases address a very different set of circumstances. Are you suggesting that if the EEOC did resolve these kinds of claims, that there would be a different answer? I'm not saying that if it resolved it in the way of a normal exhaustion requirement the way you were talking about in Woodford v. Noe, but what I'm saying is that if you looked like Thunder Basin or Elgin, so that where you know, you get counsel, you go to the court, you go to the administrative agency. There is no district court jurisdiction at all at the first instance. Then you get a judicial administrative record. You go up to a court of appeal. Congress could do that if they wanted, but they haven't chosen to do that. Kagan. Well, I guess what I'm asking is, suppose that everything in this statutory structure is exactly the same, except that the EEOC had actually been given the ability to resolve claims rather than simply to assist in the mediation of claims. Right. And I think the case comes out the same way, because then I think it looks still like just an exhaustion requirement, not like a Thunder Basin, Elgin line case. And I don't think, as our friends argue, that there is an exception from the Arbaugh clear statement rule for exhaustion-type schemes. I think they're arguing that even if there isn't one, that we should recognize one or create one, an exception for administrative exhaustion schemes. And so can you just take that directly, why that would be a bad idea? Yes, Your Honor. I think it would be a bad idea for several reasons. Let me start with the burden that it would impose on the district courts in cases like this one. You would be asking district courts in every single Title VII case, at the beginning of the case, to look into not whether there was a charge filed or not. That's relatively easy. Courts could probably do that. But into whether the charge captures the things that are in the complaint, and not just captures them, but consistent with the rules that the EEOC has and district courts have, that it could also be reasonably related to what's in the charge, not just that it's directly what's in the charge. So district courts would have to engage in this extremely articulated analysis at the beginning of every single case, sua sponte, because they have to assure themselves of their Federal jurisdiction. That's an extraordinary burden to place on the district courts and on the parties, such as in our case where we've been litigating for 5 years, and it would wipe out two rounds of appeals to the Fifth Circuit, all kinds of other litigation that we've   done, Your Honor. You said it would be a burden on the parties, a burden on the plaintiff. It would be a burden on the plaintiff, yes, Your Honor. It wouldn't necessarily be a burden on the defendant, because they would be able to get out of this lawsuit. That's true. Let me turn a little bit to the incentives plaintiffs and defendants have to bring up this defense, because my friend talked about that a little bit earlier. I don't understand this argument that defendants don't have an incentive to bring up the lack of a charge or the fact that the charge isn't good enough. As we noted in our brief, we point out a defense manual for Title VII cases. It says bring up these defenses immediately. And that's because most of the time you'll be able to get rid of the claim. It is a mandatory requirement.  And there is not enough time in most cases for the plaintiff to go back to the agency, get an amended charge, and come back to the district court. The 300-day period will have run. And so it – in most cases, it is effectively a win on the merits to get this case out on the lack of the charge of harm. Alito, go ahead. Alito, if it's just a mandatory claims processing rule, do you think that a district court would nevertheless have discretion to raise it sui sponte? I think so under Davie-McDonough, Your Honor, with the one caveat that it's different than Davie-McDonough, and that that was just a time calculation, so that's easy to do. As I was just talking about a couple of minutes ago, this is quite complicated, because there might have to be discovery, you might have to figure out whether the charge could grow into the complaint and that sort of thing. So I would urge district courts not to do it in general because it's dangerous. But I think they have the discretion to do it. And then it's just an abuse of discretion analysis on appeal, if you get there. If I could just turn to the – we've been talking about the incentives defendants have to raise the charge requirement as a defense. But plaintiffs also have extremely strong incentives to go to the EEOC. First of all, of course, they'll lose if they don't, so that's a big problem. But more to the point, you want to have that chance that the EEOC will come into your case on your side. That's an extremely powerful tool in the hands of plaintiffs. There is a conciliation process that could be extremely useful for plaintiffs to use. And there's also mediation, a more informal process that the EEOC has, to help get you resolution. So I think the incentives for plaintiffs are even more powerful than the incentives for defendants to comply with the EEOC standards. Alito, do you have any idea what percentage of charges filed with the EEOC are resolved through conciliation and therefore never have to be litigated? I don't have the exact number, Your Honor. I know it's very low. I think most cases don't get resolved. I think maybe the United States might have that number exactly. But it's unless my memory is serving me wrong, I think it's under 20 percent. Under what? 20 percent, Your Honor. So I think the incentives plaintiffs have are very strong for going to the EEOC. And the EEOC is a very strong incentive for the plaintiffs to comply with the EEOC.  And so I think the incentives plaintiffs have are very strong for going to the EEOC. And if it's even 20 percent, wouldn't it be important from the perspective of the courts to require the plaintiffs to do that? That's 20 percent or 15 percent fewer cases that have to be litigated? It's absolutely important, Your Honor. And our position throughout this litigation has been the charge requirement is crucial to the way Title VII works. And we don't dispute that. In most cases, if you don't comply with the Title VII requirement, you're going to lose. And that's the way the statute should work. But it's just not a jurisdictional bar. It doesn't comply with the clear statement rule set forth in Arbol for the high level of burden you have to get to for it to be a jurisdictional rule. And on one other point on these incentives, we have been running a natural experiment across this country on whether our rule works or not. As our friends on the other side can see, there's at least eight circuits that have already adopted our rule. And there is no indication, not a shred of empirical evidence that our friends on the other side can point to, that there is a problem with our rule or how it is working in the district courts or in the courts of appeal. And, indeed, the EEOC is with us in this case through the United States, and they don't think that their prerogatives are being jeopardized. Roberts. What sort of empirical evidence are you looking for? It would be very hard to find it, Your Honor. I can see that. I know. We get this argument quite a bit. The rule's been here, and look, there's no great crisis there, there's no great crisis there. But it's hard when you think about it to try to figure out how that evidence would be compiled. Absolutely. And I have two answers to that to try to get there. One is that I think the EEOC has the empirical tools to observe what's happening in the district courts, to make sure the same number of charges are going forward, there's not some sudden drop-off of charges because suddenly the rule is non-jurisdictional. So I think they could see if something was happening. It's their world, and I think they would be able to notice. The other thing is, it's true that in general it's hard for it to bubble up because these kind of cases are rare. But I still see you think you would see some evidence in the courts of appeals as people come with these claims that they haven't gone to the EEOC at all on, and then the court of appeals starts saying, well, why, why do we have this case at all? And there's just not a single case that looks like that. The cases that there are all look like this case, where there is a charge. The question is, is this charge sufficient? Is there enough in the charge to get you to the allegations? Roberts You've looked and there's not a single case like that? Dreeben We haven't found one, and maybe I'm misremembering right now, but I don't think we've found a case that is like what I'm describing. Roberts Well, I guess they – probably most of them would be unreported in the first place, I would assume. Dreeben Probably so, Your Honor, if they were – if there was no charge and they were coming up to the court of appeals. Sotomayor How many cases have you found like this one, where there's been a finding by a circuit court that a party has basically waived the mandatory rule? Dreeben It's not that many, but there are some. We have them in our brief, in the footnotes from the courts of appeals. But also, when I think about that question, I also think that Zipes and Arbaugh are this kind of case. And so it has come up before in this Court. I think it's Zipes that was actually brought up after trial. And so that just shows you that this kind of problem could be very harmful to the way the courts work. Well, if there are no further questions, I could leave this Court with one final thought, which is that this Court has done a lot of work in the last 15 years to clear up the profligate use of the word jurisdictional. Our friends on the other side want you to blur that line again and reinject uncertainty back into these cases. We urge you not to do that and affirm the judgment below. Thank you. Roberts. Thank you, counsel. Mr. Bond. Mr. Chief Justice, and may it please the Court. Arbaugh's Bright Line rule resolves this case. Title VII's charge filing requirement is not jurisdictional because Congress did not clearly state that it is. Now, Petitioner's primary submission is that the Court should manufacture exceptions to that clear statement rule based on an opposite doctrine, but the Court should reject that for several reasons. First, those exceptions do not exist in this Court's case law. Second, adopting them would require blurring Arbaugh's Bright Line and overturning decisions of this Court. And third, as I think has come up already, those exceptions would not apply here in any event. Now, I'd like to touch on four particular points, but first, Justice Alito, the number you're looking for is approximately 1 percent per year of cases that are successfully conciliated. The site is in note 5 of our brief. The Commission's website details these statistics. Now, the four topics I'd like to cover are, first, Petitioner's exception for exhaustion requirements. Second, the provision in E16 for Federal employer discrimination claims. Third, the argument that this requirement serves too important a purpose to be waivable. And finally, the analogy to Thunder Basin. Now, turning first to the exhaustion exception that Petitioner proposes, as I think has already been explored this morning, that exception would not apply to Title VII's charge filing requirement in any event, because as this Court already recognized in Woodford v. No in rejecting this same analogy, it is not in any sense an exhaustion requirement. You're not asking the agency for a decision. It is not deciding anything on, again, the non-Federal employer side. 16 is a little bit different, as I'll get to. And the analogy to the NLRA actually works against Petitioner, because as the Court noted at Zipes and Petitioner acknowledges, the NLRA was a model for much of Title VII's remedial scheme, but Congress did not copy over the critical feature of the NLRA, which is in 160E of Title 29, which is the provision that grants jurisdiction over enforcement actions and a corresponding provision grants review to the court or jurisdiction to review decisions by the board to the court of appeals. And it goes on to say a court may not consider an issue not presented to the board. That's the provision on the basis of which this Court has held that there's no jurisdiction over issues not presented to the board. But even if you thought this fell within the ambit of some exhaustion requirement, this Court's cases do not recognize that kind of exception. Petitioner points to no case that has held that, and none of Petitioner's cases before Arbaugh recognize any kind of bright-line rule or even presumption that those requirements are jurisdiction. Alitoso, what if there were an exhaustion requirement, but the agency's decision was that there was no jurisdiction, but the losing party before the agency could get a de novo lawsuit in district court? Under those circumstances, wouldn't it be the inference that Congress made that jurisdictional be a reasonable one? Not on those facts standing alone, but Congress certainly could, and in some statutes has, made it jurisdictional through the language it's enacted. A good example is actually the FTCA, the Federal Tort Claims Act, which this Court addressed in McNeill, which is a pre-Arbaugh case, but we think was correct under Arbaugh, because the jurisdictional grant in section 1346B begins by saying, subject to the provisions of chapter 171 of Title 28, which includes the presentment requirement that McNeill addressed. So that satisfies the clear statement rule, because there is an express link between the jurisdictional grant and the presentment requirement, on top of which it involves only claims that, as Justice Ginsburg noted, implicate Federal sovereign immunity, which is jurisdictional on its own. Mr. Bond, what do you say to the Chief Justice's concern that this is a statute that predates Arbaugh? Now, I know you're going to tell me immediately that we've done this before and applied Arbaugh retroactively to statutes preexisting Arbaugh. But besides that argument, what rationale do you think supports us doing so? So I would point to the rationale that Arbaugh gave. It was about reflecting or ascertaining Congress's intent. Arbaugh went through, before announcing the clear statement rule, the severe consequences of deeming a requirement jurisdictional, including that it means courts must raise the sua sponte, it can wipe out litigation years after the fact or up on appeal, it means judges instead of juries are deciding these questions in the typical case, and for all of those reasons, given those consequences, courts should not assume that Congress does that lightly or inadvertently. And as Mr. Maconian suggested, it's the same with other presumptions that this Court applies that are interpretive presumptions aimed at getting to Congress's intent. Even in areas of the law. Roberts, we normally apply our interpretive presumptions and all judicial decisions retroactively. I mean, that's our consistent rule. It's supposed to be, right? We certainly do apply them to existing statutes, as you do in the extraterritoriality context. Well, our decisions are normally retroactive in their application, not merely prospective. Exactly right. That's right. So an additional virtue of Arbaugh is that it's, as the Court said, leaves the ball in Congress's court by creating a clear baseline. But it's certainly not the case that that presumption or any other applies only going forward. And I think the problem that if you created an exhaustion exception now is that you would blur Arbaugh's white-line rule, and you would not only create uncertainty for lower courts about exactly how this rule applies, but you'd also make it more difficult for Congress to say in the future whether it means a requirement to be jurisdictional. And as has already been explored, this Court has applied Arbaugh to exhaustion requirements, like EME Homer City, and has explained in Reed that it applies across the board to elements and to prerequisites to suit alike. Now, if I can turn second to section 16C, the provision that governs suits claiming discrimination by Federal employers, it's very different legally and practically from what's at issue here under 5F. The legal differences are twofold. First, it involves suits against the government or government agencies, so it always involves Federal sovereign immunity. And second, on top of that, the language is starkly different in 16C. It doesn't say someone aggrieved by discrimination. It says someone who's aggrieved by the final disposition of his complaint or the failure to act on his complaint. That looks like the FTCA, where your whole grievance for coming into court is that the agency has handled your claim in a way that's not fair. Sotomayor, why would you have to get into this at all? No, we don't think you need to resolve 16C, and we're happy for the Court not to address that here in a case where it's not presentable. This is a footnote reserving your argument. Exactly. That's exactly right. So if I can turn third, then, to the argument that the purpose of the charge filing requirement requires or compels this Court to treat it as jurisdictional. As a legal matter, that's incorrect under this Court's decision in Reed and footnote 9. But as a practical matter, I want to emphasize that deeming this requirement non-jurisdictional does not undermine its purpose at all. The government strongly agrees that this serves an important purpose, but whether it's jurisdictional or not, as counsel for Respondent was explaining, plaintiffs have an overwhelming incentive to file a charge, and not only because if they don't do so, they bypass any chance of getting assistance from the commission, but also because their suit will likely face a fatal obstacle in court. So the only real question here is in the narrow subset of cases where a plaintiff nevertheless doesn't do so and the defendant, for whatever reason, doesn't raise that objection, must you wipe out everything else in the suit that's come to that point? And we don't see any basis in Title VII policy for that result, which wastes court's time, which creates unfair surprise to plaintiffs, which creates unjustified windfalls to defendants, and could impede the commission's own efforts because the logic of Petitioner's position would extend, we think, to conciliation efforts by the commission. Alitoso, at what point must a defendant raise this in the answer? So we understand this to be a condition precedent that is governed by Federal Rule of Civil Procedure 9c, which means it must be pleaded generally but must be denied with particularity. Denying it with particularity may also, you know, may frequently entail putting in additional information that turns into summary judgment. The lower courts are a little uncertain over whether it has to be raised in something akin to a motion to dismiss or answer, or whether it can be raised at summary judgment. But I think the most important point is that by the time you get to appeal and beyond that, the defendant has missed the chance to raise that argument. If I could turn finally just to the analogy to Thunder Basin and just briefly explain why we don't think this implicates that. And I have a general point and a Title VII-specific point. The general point is that Title VII or that Thunder Basin applies where you have two jurisdictional grants that are undisputedly addressing the adjudicatory authority of courts and agencies, and you're just applying ordinary principles to reconcile where the boundary line is between them. ARBA is about when you have a particular box that a plaintiff must check to get relief. Is that jurisdictional at all? And for all the reasons the Court gave in ARBA, we think that you should assume it is not jurisdictional unless Congress says otherwise. The Title VII-specific response is that for three reasons Thunder Basin wouldn't apply here. First, in Thunder Basin and Elgin, you have a statute that arguably has peeled back by implication 1331. We know that's not true in Title VII because ARBA said so and because the point of Title VII's jurisdictional provision was to expand jurisdiction. Second, Respondent didn't try to bring a different kind of suit in a different forum than Title VII contemplates. She sued under Title VII for a de novo determination of her claim in district court. And finally, she's not trying to end run any adjudicatory process in the agency because for non-Federal employers, there is no agency adjudicator. The EEOC investigates charges and ultimately decides whether to bring its own suit. It doesn't render a decision. And so extending Thunder Basin over here, we submit, does not – is not supported by any of the rationales the Court gave in Thunder Basin and Elgin. And just to touch briefly on the question about Elgin, in that case it's true that Elgin's issues were beyond the agency's competence, and reasonable minds could disagree there, although we think the Court had the right answer. But here, where there's no agency decision at all, nothing in Thunder Basin or Elgin's reasoning supports precluding review in district courts entirely. If the Court has no questions, we ask that you affirm. Roberts. Thank you, counsel. Four minutes, Ms. Sindsdijk. Thank you. Just a few points. I want to start out by noting that a lot of this argument, and particularly Respondent's argument, focused on the practicalities. But when it comes to jurisdiction, we know that Congress controls jurisdiction. Congress determines when this Court has power to do things. And so the key is statutory intent. It's not what the agency that's implementing the statute thinks. It's not what the practicalities might suggest. It's what Congress actually said. And here, in F-1, it said a civil action may be brought only after a suit is – only after a claim is dismissed or 180 days have passed. And then in F-3, it said that there is jurisdiction only over actions brought under this subchapter. But if we do want to address the practicalities, I think there's a little bit to clean up here. Justice Alito, you asked, well, how many of these things are being resolved? And the government said, well, only 1 percent are being conciliated. But the government's own website, the one that they cite at footnote 5, demonstrates that about 14 percent of EEOC claims are actually being – are being resolved to the benefit of the employee. And if you look at the Texas Workforce Commission's website, its annual report suggests that 25 percent of the claims that it's resolving are actually resolved to the benefit of the employee. So – and then this question about, well, why would a plaintiff ever not exhaust? Well, we looked, and just in the last two months on Westlaw, there are at least 50 opinions in which the courts are dismissing claims because they're unexhausted. So there are many reasons you can speculate about, but it is certainly the case that right now, in our natural experiment, plaintiffs are not bringing their – are not bringing their claims to the EEOC as Congress directed. Ginsburg. How many of those are cases like this one where there was a complaint? She started out with a complaint of, I think, gender-based discrimination and retaliation. And – but then in the end, the claim she wanted to put forward was a religion-based. So it's not that she didn't file a charge. She did. She even tried to amend it by scratching, writing in the word religion, but not stating anything about it. So how many of those cases where there was no exhaustion of the claim brought to court were cases like this, where there was a charge of some kind, but the charge didn't charge the right thing? So we found eight cases where there just had been no trip to the EEOC at all. So that's about a sixth of the cases are exactly the no trip to the EEOC at all. The remainder, yes, are this sort of case. But I would, again, emphasize courts universally apply a pretty plaintiff-friendly position with respect to whether somebody has exhausted or not. So they look at whether it's related to or grows out of the charge. So when we're talking about not raised at all, we're talking about they didn't even mention this type of discrimination. The EEOC had no idea. It's something that happened after the EEOC's investigation was concluded. But I want to move on to my third point, because there's a lot of suggestion here that what we're asking for is a new rule. But we are not. We are pointing to cases dating back from 1907, in which this Court has held that when Congress vests authority first in the hands of an expert agency, it intends to displace the original jurisdiction of the district courts. And they have attempted to do that. Ginsburg-Miller That was because they gave the agency the authority to do what ordinarily district courts do. That is, the agency was the tribunal of first instance. That's an entirely different pattern. The NLRB, the Social Security Administration, they all act as tribunals of first instance. And then the review is appellate review. Here, the EEOC is not acting as any kind of first instance forum. Kagan Justice Ginsburg, in McNeil, that was a scenario exactly like this. What the agency was empowered to do was to attempt to reach a settlement, or they could just not act for 6 months. So we don't have to do that. Ginsburg-Miller That was, again, suing the government. It was under the Tort Claims Act. And the government can waive or not waive sovereign immunity as it will. And, Justice Ginsburg, 2000e5 does apply to the government. If there are no further questions, I would ask this Court to reverse. Thank you. Roberts Thank you, counsel. The case is submitted.